UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| MICHAEL GOINS, ) | Civil Action No.: 4:14-cv-4639-RMG-TER |
| ) | |
| Plaintiff, ) | |
| ) | |
| -vs- ) | |
| ) | |
| ) | |
| JIMMY PACHECO, with the division of ) | **REPORT AND RECOMMENDATION** |
| mental health of the South Carolina Dep't ) | |
| of Corrections, in his individual and official ) | |
| capacities, KARYN McGUCKIN, ) | |
| BETHANY GENIESE DONALD, ) | |
| COURTNEY WOODRUFF, KANISHA ) | |
| MILLER, and SYLVIA WARDEY, each ) | |
| in their individual and official capacities, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**I.     INTRODUCTION**

Plaintiff, who is proceeding pro se, brings this action pursuant to 42 U.S.C. § 1983, alleging that Defendants were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment right to be free from cruel and unusual punishment. He also alleges state law claims of gross negligence and medical malpractice. Presently before the court is Defendants' Motion for Summary Judgment (Document # 38). Because he is proceeding pro se, Plaintiff was warned pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), that a failure to respond to Defendants' motion for summary judgment could result in the motion being granted, resulting in dismissal of his claims. Plaintiff has not filed a response. All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d), DSC. This report and recommendation is entered for review by the district

judge.

## II.     RULE 41(b) DISMISSAL

"The Federal Rules of Civil Procedure recognize that courts must have the authority to control litigation before them, and this authority includes the power to order dismissal of an action for failure to comply with court orders. Fed.R.Civ.P. 41(b)." Ballard v. Carlson, 882 F.2d 93, 95 (4th Cir.1989). "Federal courts possess an inherent authority to dismiss cases with prejudice sua sponte." Gantt v. Maryland Division of Correction, 894 F.Supp. 226, 229 (D.Md. 1995) (citing Link v. Wabash R. Co., 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); White v. Raymark Industs., Inc., 783 F.2d 1175 (4th Cir.1986); Zaczek v. Fauquier County, Va., 764 F.Supp. 1071, 1074 (E.D.Va.1991)).

The Fourth Circuit, in Davis v. Williams, 588 F.2d 69, 70 (4th Cir. 1978), recognizing that dismissal with prejudice is a harsh sanction which should not be invoked lightly, set forth four considerations in determining whether Rule 41(b) dismissal is appropriate: (1) the degree of personal responsibility on the part of the plaintiff; (2) the amount of prejudice to the defendant caused by the delay; (3) the presence or absence of a drawn out history of deliberately proceeding in a dilatory fashion; and (4) the effectiveness of sanctions less drastic than dismissal. Id. at 70.

Subsequently, however, the Fourth Circuit noted that "the four factors ... are not a rigid four-pronged test." Ballard, 882 F.2d at 95. "Here, we think the Magistrate's explicit warning that a recommendation of dismissal would result from failure to obey his order is a critical fact that distinguishes this case from those cited by appellant. . . . In view of the warning, the district court had little alternative to dismissal. Any other course would have placed the credibility of the court in doubt and invited abuse." Id. at 95-96.

In the present case, Plaintiff is proceeding pro se and, thus, is entirely responsible for his actions. It is solely through Plaintiff's neglect, and not that of an attorney, that no response has been filed to Defendants' motion, despite the warning that a failure to respond could result in dismissal of his claims. Plaintiff has not requested an extension of time to respond to the motion for summary judgment or otherwise addressed the court with respect to this motion. Because Plaintiff has failed to file a response to the motion for summary judgment, the undersigned concludes Plaintiff has abandoned his claims. No other reasonable sanctions short of dismissal are available. Accordingly, it is recommended that this case be dismissed pursuant to Fed.R.Civ.P. 41(b).

In the alternative, the undersigned will address the arguments raised in Defendants' motion for summary judgment.

### III.    MOTION FOR SUMMARY JUDGMENT

**A.    Facts**

In this case, Plaintiff alleges that Defendant Dr. Jimmy Pacheco failed to provide him with the proper medication to treat his mental health condition, either prescribing too much medication or too little medication. Complaint pp. 3-4. He alleges that he experienced excruciating pain and suffering as a result of the improper dosage of medication. Complaint p. 4. He also alleges that Dr. Pacheco prescribed the improper medication in retaliation for a grievance Plaintiff filed against him. Complaint pp. 3-4. As to the remaining Defendants, all mental health counselors, Plaintiff alleges that they ignored his requests to see Dr. Pacheco about his medication. Complaint p. 4.

Dr. Pacheco is a part-time employee of SCDC and is also employed by the South Carolina Department of Mental Health. He is a physician licensed in the State of South Carolina and has been licensed since 1991. Dr. Pacheco specializes in the area of psychiatry and is board-certified in

psychiatry. Dr. Pacheco stated he recalls the Plaintiff and has also had the opportunity to review Plaintiff's medical records. Pacheco Aff. ¶¶ 1-3.

Dr. Pacheco first saw the Plaintiff on April 6, 2013. When he saw the Plaintiff at that time, Plaintiff complained of problems with anxiety and decreased sleep and stated that his heart would start beating rapidly all of a sudden and he would also start sweating. Dr. Pacheco noted that Plaintiff was on several anticholinergic medications (i.e., Bentyl, Robaxin, and Cogentin), and suspected that these medications could be contributing to his issues. He was concerned that these medications were making Plaintiff anticholinergic which can lead to problems such as increased heart rate and sweating. Therefore, he discontinued Plaintiff's prescription for Cogentin. In addition, Dr. Pacheco switched Plaintiff from Buspar to Vistaril because Plaintiff said the Buspar was not working. He also prescribed Remeron because Plaintiff said he was having difficulty sleeping. Pacheco Aff. ¶¶ 3-4; Medical Records pp. 60-61.

Dr. Pacheco stated that Plaintiff was also prescribed Haldol, which is an antipsychotic medication. Based on Plaintiff's presentation and history, Dr. Pacheco decreased the dosage of Haldol from 7 mg to 5 mg because he did not feel Plaintiff needed to be on that high of a dose at that time. Dr. Pacheco stated Haldol is a medication that can cause individuals to have severe muscle spasms on an acute basis. This generally occurs in 25% to 30% of patients and is more likely to occur in young African-American males. Cogentin is often initially given with Haldol to help prevent these side effects. However, if an individual has such a reaction because of taking Haldol, this will normally occur in the first 48 hours after beginning the medication. For this reason, Cogentin generally is not needed and generally will not be prescribed on a long-term basis because the dystonic reactions caused by Haldol are acute and immediate. Dr. Pacheco discontinued the Cogentin

because Plaintiff was beyond the time where he would expect potential side effects from the Haldol. Furthermore, he stated taking Cogentin on a long-term basis can lead to other potential problems. In addition, he did not feel that Cogentin was necessary at that time and never wants to prescribe medications that he believes are not necessary. Pacheco Aff. ¶ 4.

Dr. Pacheco next saw Plaintiff on June 8, 2013. Plaintiff stated that he had weight loss as well as tachycardia (increased heart rate) and diaphoresis (sweating) and also stated that he was hearing voices. At that time, Dr. Pacheco increased the Plaintiff's Haldol prescription back to 7 mg and also increased his prescription of Remeron to help with anxiety. He did not prescribe Cogentin at that time as he did not, and still does not, believe it was indicated. Pacheco Aff. ¶ 5; Medical Records pp. 54-55.

Between his June 8, 2013, visit with Dr. Pacheco and his next visit on September 12, 2013, Plaintiff refused to take his medications and/or complained to a Clinical Correctional Counselor (CCC) that they were not right[1] on several occasions. Medical Records pp. 46, 47-48, 49, 52, 53, 54. Dr. Pacheco stated it has been common for the Plaintiff to periodically refuse to take some or all of his medications. He avers that medications for mental health conditions need to be taken daily as prescribed in order to be effective. If the patient stops taking or refuses to take the medications,

---

[1]The medical records indicate that there was a discrepancy as to whether Plaintiff was supposed to receive all 7 mg of Haldol at night or whether he was to receive 2 mg in the morning and 5 mg at night. Medical Records p. 53. A CCC emailed Dr. Pacheco for clarification, but never received a response. Medical Records pp. 53, 49, 47. Encounter 627 in Plaintiff's medical records appears to indicate that on August 21, 2013, Dr. Pacheco stated "Please give all of the Haldol dose at bedtime." Medical Records p. 47. However, in encounter 628 on August 23, 2013, the CCC indicates that she still has not received clarification from Dr. Pacheco regarding Plaintiff's Haldol. Id. Encounter 633 on September 12, 2013, appears to indicate that Plaintiff was still receiving (but had refused) 2 mg in the morning and 5 mg at night. Medical Records p. 46.

they generally are not as effective. He also noted that on at least one occasion, July 2, 2013, Plaintiff stated he did not want to receive Vistaril, but instead wanted Cogentin. Cogentin is a medication which is subject to abuse and it raises concerns when a patient requests a medication of this nature by name. Dr. Pacheco stated there was an additional concern because in May 2012 Plaintiff had been found hoarding Cogentin and he was found with over 80 pills in his possession.  Pacheco Aff. ¶ 6.

When Dr. Pacheco next saw the Plaintiff on September 12, 2013, Plaintiff was complaining of joint and muscle pain. He did not complain to Dr. Pacheco that his medications were "not right." Rather, he stated that the medications were controlling his symptoms, but he was having pain. Dr. Pacheco informed the Plaintiff that he did not believe these pains were related to the medications, but Plaintiff requested to stop the medications at that time and he stopped the medications per Plaintiff's request. Dr. Pacheco saw the Plaintiff again on September 27, 2013. The Plaintiff at that time stated that he wanted to get back on the medications. He prescribed the Plaintiff Remeron and Haldol[2] and because Plaintiff complained of muscle spasms, he also placed him on Cogentin. However, Dr. Pacheco informed Plaintiff that the Cogentin would have to be crushed because as discussed above Plaintiff had previously been caught hoarding this medication. Plaintiff agreed for the Cogentin to be crushed and placed in water when administered.  Pacheco Aff. ¶ 8; Medical Records p. 44.

Dr. Pacheco next saw the Plaintiff on December 7, 2013. Plaintiff at that time said that his paranoia and depression were under control and he denied any side effects. However, he had reported to the counselor that he was having panic attacks. Dr. Pacheco started the Plaintiff on Inderal for his

---

[2]Upon renewing the Haldol prescription, Dr. Pacheco prescribed 2 mg at noon and 5 mg at night.  Medical Records p. 44.

anxiety, but informed medical personnel that they needed to discontinue the Metoprolol because Inderal is also a blood pressure medication. Pacheco Aff. ¶ 9; Medical Records pp. 38-39.

Though he was seen in the interim by either another psychiatrist or the nurse practitioner, Dr. Pacheco did not see the Plaintiff again until October 3, 2014. At that time, Plaintiff stated that he was schizophrenic and heard voices, but when Dr. Pacheco assessed him, the "voices" were more inner thoughts instead of actually hearing voices. Plaintiff also complained of constipation and noted that he was taking Remeron, Bentyl, and Cogentin. Dr. Pacheco was concerned that the Plaintiff was using the Bentyl and Cogentin for recreational purposes to obtain a euphoric effect and decreased his prescription for Cogentin. He further did not feel that this level of Cogentin was necessary and thought this would help with the constipation. He also stated there was no evidence of psychosis and changed his diagnosis from schizophrenia to psychosis NOS (not otherwise specified). Pacheco Aff. ¶ 10; Medical Records pp. 13-14.

Dr. Pacheco again saw the Plaintiff on January 10, 2015. The Plaintiff stated, and appeared, to be doing well and he continued Plaintiff's medications. Dr. Pacheco did see the Plaintiff one additional occasion on May 30, 2015. The Plaintiff at that time was doing well and stated he had no problems or side effects from medications. Dr. Pacheco stated at all times in his treatment of the Plaintiff, he prescribed what he felt to be appropriate medications. He further stated based on his review of the Plaintiff's medical records, it is his opinion that the Plaintiff has received appropriate mental health care. Pacheco Aff. ¶¶ 11-12; Medical Records p. 7.

Defendants Courtney Woodruff, Kanisha Miller, Karyn McGuckin, Bethany Donald Williams, and Sylvia Wardy, are current or former CCCs with SCDC. Each stated that as a CCC, they met with and provided counseling for inmates. They stated inmates are assigned to a counselor

and are seen by that counselor unless there is an emergency situation where the inmate needs to be seen and their counselor is unavailable or if the inmate is placed on Crisis Intervention. Each of them stated they vaguely recall the Plaintiff, but have not reviewed his medical records. Ms. Woodruff and Ms. Wardy stated to the best of their recollection Plaintiff was never assigned to their caseload while Ms. McGuckin, Ms. Williams, and Ms. Miller stated that it is their recollection Plaintiff was assigned to their caseload at some time. Ms. Woodruff and Ms. Wardy stated even though Plaintiff was not assigned to their caseload, it is possible they saw him, particularly on Crisis Intervention. Miller Aff. ¶¶ 2-5; Woodruff Aff. ¶¶ 2-5; Wardy Aff. ¶¶ 2-5; Williams Aff. ¶¶ 2-5; McGuckin Aff. ¶¶ 2-5.

Each of these individuals stated that regardless of whether they saw him because he was assigned to their caseload or if they saw him in passing or on Crisis Intervention, if he had complained to them or stated to them that he was having problems with his medications, they would have referred him to the psychiatrist or nurse practitioner. They stated that as a CCC, they did not have the authority to prescribe medications and this can only be done by the psychiatrist or nurse practitioner. Miller Aff. ¶¶ 4-5; Woodruff Aff. ¶¶ 4-5; Wardy Aff. ¶¶ 4-5; Williams Aff. ¶¶ 4-5; McGuckin Aff. ¶¶ 4-5.

Plaintiff asserts that during some unspecified visit with Dr. Pacheco, Dr. Pacheco asked him why Plaintiff wrote him up[3] and Plaintiff told him he just wanted his medications "turned back on." Verified Complaint p. 3.  He asserts that "Dr. Pacheco only turned on one medication and told me to take it and it would 'fix me right on up.'" Id.  Plaintiff subsequently visited Dr. Pacheco on an unspecified date and complained of pain he was experiencing.  Dr. Pacheco "turned on [Plaintiff's]

---

[3]This "write-up" is not in the record.

medication after a hassle and told [Plaintiff] to never write him up again." Plaintiff asserts that Dr. Pacheco retaliated against him for writing him up by not prescribing the proper medication.

### B.     Standard of Review

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. at 322. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present

evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

### C.  Discussion

#### 1.  Section 1983 generally

Plaintiff brings his claims under § 1983, alleging violations of his First, Eighth and Fourteenth Amendment rights.  Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Albright v. Oliver, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting Baker v. McCollan, 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). A legal action under § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 707, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999). To be successful on a claim under § 1983, a plaintiff must establish two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law. West v. Atkins, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

#### 2.  Medical Indifference

Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs. To state a claim for deliberate indifference to serious medical needs in violation of the Eighth Amendment, "[a] plaintiff must satisfy two elements ...: he must show a serious medical need and

he must prove the defendant's purposeful indifference thereto." Sires v. Berman, 834 F.2d 9, 12 (1st Cir.1987). In the case of Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court reviewed the Eighth Amendment prohibition of punishments which "involve the unnecessary and wanton infliction of pain." Id. (quoting Gregg v. Georgia, 428 U.S. 153, 169–73, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). The court stated:

> An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.... We therefore conclude that deliberate indifference to serious medical needs of a prisoner constitutes the "unnecessary and wanton infliction of pain," Gregg v. Georgia, supra, at 173, (joint opinion), proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

Id. at 103–105 (footnotes omitted).

Despite finding that "deliberate indifference to serious medical needs" was unconstitutional, the court was careful to note, however, that "an inadvertent failure to provide adequate medical care" does not meet the standard necessary to allege an Eighth Amendment violation:

> ... a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

Id. at 107.  There, the court noted that treatment "must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness (citation omitted), ... nevertheless, mere negligence or malpractice does not violate the Eighth Amendment." Miltier

v. Beorn, 896 F.2d 848, 841 (4th Cir.1990). Unless medical needs were serious or life threatening, and the Defendant was deliberately and intentionally indifferent to those needs of which he was aware at the time, the plaintiff may not prevail. Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); Sosebee v. Murphy, 797 F.2d 179 (4th Cir.1986).

Plaintiff alleges that Dr. Pacheco did not properly medicate him to treat his mental conditions and associated side-effects. In his verified complaint, he states "[o]n my first visit with Doctor Pacheco in 2012 or 2013 he did something with my mental health medication that I did not ask him to do or there was no reason to do. He discontinued all of my medications for no reason." Verified Comp. p. 3. However, the medical records as well as Dr. Pacheco's affidavit reveal that he did not discontinue all of Plaintiff's medications during his first visit with Plaintiff. Rather, he decreased the dosage of some medications, discontinued other medications, and added new medications based upon Plaintiff's complaints. Pacheco Aff. ¶¶ 3-4; Medical Records pp. 60-61. When Dr. Pacheco saw Plaintiff again on June 8, 2013, he increased his Haldol dosage to the original amount because Plaintiff reported an increase in hearing voices. Medical Records pp. 54-55. Plaintiff saw a CCC approximately once a month for a periodic review and additionally as requested by Plaintiff. Because the CCCs could not prescribe medicine, when Plaintiff complained that his medications were not right or that he was experiencing pain[4], the CCC noted his complaint in the record and would either "leave the encounter open for medical" or email Dr. Pacheco. Medical Records pp. 46, 47, 48, 49, 52. On September 12, 2013, when Plaintiff specifically asked to return to the psych

---

[4]Dr. Pacheco noted in his affidavit that Plaintiff specifically requested Cogentin for this pain, which is subject to abuse and which Plaintiff had previously been caught hoarding. Pacheco Aff. ¶ 6. The medical records also include other instances of suspected drug-seeking behavior and hoarding of medication subject to abuse. Medical Records pp. 40, 43, 44, 86.

clinic[5], he was seen by Dr. Pacheco the same day. Medical Records p. 46. At that time, Dr. Pacheco discontinued all of Plaintiff's medications per his request. Medical Records p. 46. Approximately a week later, when Plaintiff expressed concerns to the CCC that his muscle pain was gone but he was hearing voices again and his paranoia had increased, the CCC stated that she would contact Dr. Pacheco about Plaintiff's concerns. Medical Records p. 45. One week later, Plaintiff saw Dr. Pacheco, who put Plaintiff back on his medications and added Cogentin to address any associated muscle pain. Medical Records p. 44. When Dr. Pacheco next saw Plaintiff on December 7, 2013, he added Inderal because Plaintiff complained that he was having panic attacks. Medical Records pp. 38-39. Thereafter, Plaintiff reported that he was doing well with the medications and was not having side-effects. Medical Records pp. 29, 30, 33, 36.

In his affidavit, as set forth above, Dr. Pacheco describes the complaints made by Plaintiff regarding anxiety, hearing voices, rapid heartbeat, sweating, lack of sleep, and joint and muscle pain, and explains in detail his reasons for treating Plaintiff with the particular medications he prescribed. The fact that the Plaintiff disagrees with the treatment he received from Dr. Pacheco does not rise to the level of an actionable claim under § 1983. See Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); see also Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977). Mere disagreement between the prisoner and prison officials regarding the proper treatment required does not constitute deliberate indifference. The Constitution requires only that the prisoner receive adequate medical care; he is not guaranteed the treatment of his choice. Jackson v. Fair, 846 F.2d 811, 817 (1st Cir.1988). The evidence in the record reveals that Dr. Pacheco made a conscious effort to prescribe medications he believed were appropriate and otherwise provide proper treatment to Plaintiff. There

---

[5]The medical records indicate that CCCs typically met with Plaintiff at his cell door.

is no evidence that Dr. Pacheco "completely fail[ed] to consider [Plaintiff's] complaints or . . . act[ed] intentionally to delay or deny [Plaintiff] access to adequate medical care." Bridges v. Keller, 519 Fed. App'x 786, 787 (2013). Likewise, Plaintiff fails to show that the CCC Defendants were deliberately indifferent to his serious medical needs. While non-medical personnel may be liable for medical indifference if they "were personally involved in a denial of treatment, deliberately interfered with treatment, or tacitly authorized or were indifferent to a prison physician's misconduct," Estelle, 429 U.S. at 104–05, no such evidence exists here. Plaintiff was seen on a monthly basis or more by a CCC and they documented Plaintiff's complaints regarding the pain[6] he was suffering as a result of the alleged "excessive amount of medication or lack of medication" prescribed by Dr. Pacheco. Verified Comp. p. 4. The CCCs left these complaints open for and/or reported them to the medical personnel since they were not qualified to made changes to medications. Accordingly, summary judgment is appropriate on Plaintiff's claim for deliberate indifference to his serious medical needs against Defendants McGuckin, Donald, Woodruff, Miller and Wardy.

### 2.     First Amendment Retaliation

Plaintiff also alleges that Dr. Pacheco retaliated against him for writing him up by only renewing one of his medications after they had all been discontinued. Presumably, the write-up to which Plaintiff refers was a grievance, although there is no copy of this grievance in the record. To establish a claim for retaliation under § 1983, a plaintiff must present facts sufficient to show "either

---

[6]The undersigned notes that in between his visits with Dr. Pacheco and the CCCs, Plaintiff also visited "sick call" and had outside doctor's appointments. Medical Records pp. 13-60. The medical records do not indicate that Plaintiff complained to any of the other medical personnel about muscle spasms or pain, although he did mention that his medications were not right.

-14-

that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." Adams v. Rice, 40 F.3d 72, 75 (4th Cir.1994). Although the Fourth Circuit has not issued a published opinion on the question of whether the filing of a grievance by a prisoner implicates the First Amendment, several circuits have held that prison officials may not retaliate against a prisoner for filing grievances. See Hill v. Lapin, 630 F.3d 468, 472 (6th Cir.2010) (noting that a prisoner has an "undisputed First Amendment right to file grievances against prison officials on his own behalf"); Haynes v. Stephenson, 588 F.3d 1152, 1155–56 (8th Cir.2009) ("The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity."); Boxer X v. Harris, 437 F.3d 1107, 1112 (11th Cir.2006) ("First Amendment rights to free speech and to petition the government for a redress of grievances are violated when a prisoner is punished for filing a grievance concerning the conditions of his imprisonment."); see also Gullett v. Wilt, 869 F.2d 593, 1989 WL 14614 at *2 (4th Cir.1989) (unpublished table decision) (noting that First Amendment rights "are implicated by [the plaintiff's] claim that he is being transferred because prison officials are retaliating for [his] numerous institutional grievances").

Assuming Plaintiff's "write-up" of Dr. Pacheco is protected First Amendment Activity, Plaintiff must also show that he "suffered some adversity in response to [his] exercise of [constitutionally] protected rights." American Civil Liberties Union of Md., Inc. v. Wicomico Cty., Md., 999 F.2d 780, 785 (4th Cir.1993). "A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of [the protected] rights." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir.2005). The medical records do not indicate a time when Dr. Pacheco discontinued all of Plaintiff's medication and then later renewed only one. On September 12, 2013, Dr. Pacheco

stopped all of Plaintiff's medications per Plaintiff's request and after Plaintiff had refused to take his medications on several occasions prior. On September 27, 2013, Dr. Pacheo reinstated Plaintiff's prescriptions for Remeron and Haldol[7] and because Plaintiff complained of muscle spasms, he also placed him on Cogentin.

Finally, Plaintiff must also show a causal relationship exists between his speech and the defendant's alleged retaliatory action. Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685–86 (4th Cir.2000). The record does not reveal when Plaintiff made the write-up, although Plaintiff asserts that Dr. Pacheco inquired of Plaintiff about the write-up during one of his appointments. Nevertheless, the evidence in the record is insufficient to create and issue of fact as to a causal connection between Plaintiff's write-up and any failure to prescribe appropriate medication. Accordingly, Plaintiff's retaliation claim fails.[8]

### 3.     State Law Claims

Plaintiff also alleges a state law claim for medical malpractice. However, if the district judge accepts this Report and Recommendation, the original federal jurisdiction claim will be dismissed and the only remaining claim will be Plaintiff's state law claim. Title 28 U.S.C. § 1367(c)(3)

---

[7] Upon renewing the Haldol prescription, Dr. Pacheco prescribed 2 mg at noon and 5 mg at night. Medical Records p. 44.

[8] Further, as discussed above, Dr. Pacheco describes in detail the reasons why he prescribed, discontinued, or changed the dosage of Plaintiff's medications. See Owens v. FCI Beckley, Civ. A. No. 5:12–03620, 2013 W L 4519803, at *15–16 (S.D.W.Va. Aug.27, 2013) ("The record does not support a finding that the above conduct was the result of retaliation by Defendant Largent. Defendant Largent had legitimate reasons for accessing the Wiccan locker and for removing prohibited items."); Cottrell v. Jabe, Civ. A. No. 7:10–cv–00505, 2012 WL 830469, at *12 (W.D.Va. Feb.17, 2012) (adopted at 2012 WL 830499 (Mar. 5, 2012)) (summary judgment to defendants on a retaliation claim because "the defendants' actions were not in response to Cottrell's exercise of a constitutional right and are supported by a legitimate non-retaliatory reasons").

provides, in pertinent part, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction ...." The Fourth Circuit has recognized that "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." <u>Shanaghan v. Cahill</u>, 58 F.3d 106, 110 (4th Cir.1995) (holding district court did not abuse its discretion in declining to retain jurisdiction over the state law claims). <u>See</u> also, <u>e.g.</u>, <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); <u>Revene v. Charles County Comm'rs</u>, 882 F.2d 870, 875 (4th Cir.1989). Therefore, the undersigned recommends that the district judge decline to retain jurisdiction over Plaintiff's state law cause of action for medical malpractice.

**IV.    CONCLUSION**

For the reasons discussed above, it is recommended that this case be dismissed for failure to prosecute pursuant to Fed.R.Civ.P. 41(b). In the alternative, it is recommended that Defendants' Motion for Summary Judgment (Document # 38) be granted as to Plaintiff's federal causes of action, that the court decline to exercise jurisdiction over Plaintiff's state law cause of action, and this action be dismissed in its entirety.[9]

                                                s/Thomas E. Rogers, III
                                                Thomas E. Rogers, III
                                                United States Magistrate Judge

January 8, 2016
Florence, South Carolina

                **The parties are directed to the important information on the following page.**

---

[9] If the district judge accepts this recommendation, all other pending motions will be moot.